GEORGE M. AND SHIRLEY JOHNSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Johnson v. Commissioner
Docket No. 1140-71.
United States Tax Court
T.C. Memo 1976-31; 1976 Tax Ct. Memo LEXIS 372; 35 T.C.M. (CCH) 123; T.C.M. (RIA) 760031; February 4, 1976, Filed George M. Johnson, pro se. Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: This case was assigned to *373 and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report. The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case was one of a group of 37 which were consolidated for trial, but not for opinion. At the trial evidence was received which bears upon every case in the group. Principally such evidence relates to certain contractual arrangements between the husband-petitioners' employers (Lockheed Air Service Company and Dynalectron Corporation) and the United States Air Force, as well as the employment arrangements between field team members (such as the husband-petitioners) and such employers. Respondent determined a deficiency in petitioners' 1969 Federal income taxes in the amount of $223.32. In an amendment to his answer to conform the pleadings to the proof, respondent seeks an increased deficiency in the total amount of $636.04, or an increase of $412.72. The issue is whether all or any portion of $4,184 of per diem *374 payments received by petitioner George Johnson (hereinafter "petitioner") from Dynalectron Corporation should be included in his gross income for 1969 under section 61(a) of the Internal Revenue Code of 1954; [2] and, if so, whether petitioner is entitled to deduct any or all of said amount as away-from-home traveling expenses under section 162(a)(2). FINDINGS OF FACT Petitioners, husband and wife, filed their 1969 return with the Internal Revenue Service Center at Chamblee, Georgia. At the time of filing their petition herein, they resided at Montgomery, Alabama. During 1969 petitioner was employed as a member of three different field teams by Dynalectron Corporation (hereinafter "Dynalectron"). Dynalectron, as well as Lockheed Air Service Company (hereinafter "Lockheed") had a contract with the United States Air Force during 1969, to provide field team service for the maintenance and modification of weapons systems (i.e., aircraft) and/or support equipment. These contracts were called "basic contracts" and the Air Force entered into such a contract with *375 each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, *376 however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government)-- $11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract *377 arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services *378 per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if *379 none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. *380 During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, *381 irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner was born and raised in Montgomery, *382 Alabama, and left home for the first time in 1956 when he entered the United States Navy where he served until 1959. Upon being discharged from the Navy, petitioner was employed in the Birmingham works of the Pullman Standard Company as a steelworker. From 1963 to 1965, he was employed for the first time by Dynalectron; and from 1965 to May 1968, he was employed in Montgomery as a supervisor at a bakery. In 1958, while still serving in the Navy, petitioner was married to his wife, Shirley, whom he had known since childhood in Montgomery. They had three children during 1969, the taxable year here involved. In 1968, petitioner again entered the employ of Dynalectron, as a sheet metal worker. Thereafter, he became a supervisor. Petitioner's first assignment during this second tour of duty was at Maxwell Air Force Base, at Montgomery, the town where he was then living with his wife and children. That assignment lasted only slightly less than two months (f-om May 20 to July 15, 1 68), when he was transferred to Atlanta, Georgia. The Atlanta assignment lasted only until the following January of 1969, when petitioner volunteered to be assigned to Vietnam for six months. Petitioner's Vietnam *383 assignment could not be extended unilaterally by Dynalectron, but could only be extended by petitioner's volunteering to do so. Petitioner did not so extend his Vietnam assignment, and returned to the United States at the end of July. Following a week's leave of absence which he requested and was granted, petitioner received an assignment by Dynalectron to Key Field at Meridian, where he served for the remainder of 1969, and until 1971 when he terminated his employment. Petitioner's wife and children did not accompany petitioner to Atlanta when he was assigned there in July of 1968. It appears that during a portion of 1968, Mrs. Johnson and the three children may have spent some time at the home of her parents in Fairfield Highlands, a community on the outskirts of Birmingham. However, throughout 1969, the taxable year involved, up until petitioner was assigned to Meridian in August of that year, Mrs. Johnson and the children lived in a rented house in Montgomery while petitioner was on assignment in Atlanta and in Vietnam. When petitioner was assigned to Meridian, Mrs. Johnson and the children accompanied him to that city where they lived throughout his employment. Petitioner brought *384 his family with him to Meridian because he could not afford to maintain two homes and because he liked to be together with his family. Petitioner advised Dynalectron at the time he was rehired in May 1968, that his residence was 608 8th Street, Fairfield Highlands, Alabama, which was the same address he had given during his previous 1963-65 employment with the company. That address is the residence of petitioner's mother-in-law. Petitioner had some tools, some clothing, a television set, and a dinette set stored at his mother-in-law's house, and there was space that he and his family could have occupied in that house if they had desired to do so. Petitioner's mother owned two houses in Montgomery. Petitioner has stayed in the one where his mother lived, where he had some tools and clothes stored. He visited Montgomery about two times per month, for the months he was in the United States during 1969. Petitioner was registered to vote in Alabama and had an Alabama driver's permit during that year. Dynalectron did not tell petitioner when his assignments at Atlanta or Meridian would terminate, at the times those assignments were made. Petitioner received per diem payments from *385 Dynalectron during 1969 in the aggregate amount of $4,184. He did not include any amount of per diem in gross income on his 1969 return. In his notice of deficiency, respondent included $1,191 of per diem payments in petitioner's gross income. By amendment to his answer, respondent has sought to have included in petitioner's gross income for 1969 an additional $2,993, and has sought an increased deficiency for that year. OPINION It must first be determined whether the per diem payments received by petitioner from Dynalectron in 1969 are includible in gross income for that year. It is believed that the per diem payments when received by petitioner constituted gross income. In very broad and sweeping language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" to evince a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion" (Commissioner v. Glenshaw Glass *386 Co.,supra, p. 431); and the Code contains no provision exempting per diem payments from taxation. Manifestly, then, the respondent properly included them in petitioner's gross income. Leo C. Cockrell,38 T.C. 470, 477-478, affd. (8th Cir.) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4]
The question remains whether petitioner is entitled to deduct any part or all of the per diem payments under section 162(a)(2) as expenses for travel while away from home in pursuit of his trade or business as an employee of Dynalectron. Leo C. Cockrell,supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court, in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home travel expenses: The expense must be reasonable and necessary traveling expense; it must be incurred by a taxpayer while away from home; and the expense must be incurred in pursuit of business. In the instant *387 case, the parties differ only on the point of whether petitioner was "away from home." In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only a short period of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). *388 On the other hand, if a taxpayer chooses for personal reasons to maintain a family residence far from his principal place of employment, then his additional traveling and living expenses are incurred as a result of that personal choice, and are therefore not deductible. Commissioner v. Flowers,supra;Ronald D. Kroll,supra at 561-562; Floyd Garlock,34 T.C. 611, 614 (1960); Mort L. Bixler,5 B.T.A. 1181, 1184 (1927). Similarly, if a taxpayer accepts indefinite employment outside the vicinity in which he lives, but he does not change his family residence, the travel to his new place of employment and the additional living costs which he incurs there result, not from his employment, but from his decision not to move his residence. Rendell Ownens,50 T.C. 577 (1968); Maurice M. Wills,48 T.C. 308 (1967), affd. 411 F.2d 537 (C.A. 9, 1969). Thus, the deductibility of traveling expenses and duplicate living expenses depends upon the ultimate question of whether the taxpayer, under all the circumstances, could reasonably have been expected to move his residence *389 to the vicinity of his employment. Measured by the foregoing, it is believed that petitioner was away from home during his Atlanta and Vietnam assignments, but not during his Meridian assignment. Respondent concedes that the Atlanta and Vietnam assignments were temporary, but urges that the Meridian assignment was indefinite. In the light of the contractual arrangements between Dynalectron and the Air Force, the employment arrangements between petitioner and Dynalectron, and his employment history with Dynalectron during 1968 and 1969 -- all as described in the findings of fact -- it is believed that the Meridian assignment in 1969 was likewise temporary, rather than indefinite. Respondent contends that even if all of the 1969 assignments were temporary, petitioner is not entitled to any deductions under section 162(a)(2) for away-from-home travel expenses, on the asserted ground that petitioner manintained no home away from the places where he worked. The record supports that position insofar as Meridian is concerned, but not as far as Atlanta and Vietnam are concerned. The evidence shows that Mrs. Johnson and the children lived in a rented house in Montgomery, the place where *390 petitioner and his family lived when he was rehired by Dynalectron in May 1968, while he was in Atlanta and in Vietnam. Thus, that home in Montgomery continued to constitute petitioner's tax home during his Atlanta and Vietnam assignments. His living expenses in Atlanta and Vietnam were thus those additional and duplicate ones, the burden of which section 162(a)(2) was designed to alleviate, as the Tucker case holds. The situation is different, however, as to the Meridian assignment. That city, where he and his family lived, ate, worked and slept, became his tax home. He was not away from his home in pursuit of his trade or business, and he no longer incurred any additional and duplicate living expenses for himself, as he had done in Atlanta and Vietnam. His and his family's living expenses in Meridian were those personal, living, and family expenses barred deduction by section 262. Petitioner's tenuous residential ties to his mother's home in Montgomery and that of his mother-in-law in Fairfield Highlands will not support his contention that one or the other of those two places constituted his home for tax purposes. In the light of the foregoing, petitioner should be allowed *391 a deduction under section 162(a)(2) of $3,056 (an amount equal to the per diem he received while in Atlanta and in Vietnam), but not for the $1,128 (the amount of per diem he received while in Meridian). * * * * *
In accordance with the foregoing, Decision will be enteredunder Rule 155.
Footnotes
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.